# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KENDRELLE BROWN**                                  **CIVIL ACTION**

**VERSUS**                                           **NO.  12-1411**

**ROBERT C. TANNER, WARDEN**                         **SECTION "E"(2)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  <u>See</u> 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1] Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.   STATE COURT PROCEDURAL BACKGROUND

The petitioner, Kendrelle Brown, is currently incarcerated in the Rayburn Correctional Center in Angie, Louisiana.[2]  On April 3, 2007, Brown was charged by bill of information in Orleans Parish with armed robbery and second degree battery.[3]  On July 18, 2007, the bill of information was amended to correct the date of the crimes from January 30, 2007, to October 25, 2006.[4]  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as follows:

> Scot Collins testified at trial that as he was walking home from work on St. Roch Avenue, he heard the sound of people running from between a house.  As he turned and looked he observed two men run across St. Roch and disappear between two houses. A police unit, with its light bar flashing, turned the corner at St. Claude Avenue and St. Roch. The officers stopped and asked Mr. Collins if he had seen anyone.  He told them of the two men he saw running across St. Roch and disappear between two houses.  He indicated in which direction the men ran; the police drove in that direction. Mr. Collins continued walking about four blocks to his home on St. Roch.
>
> The next night Mr. Collins was off from work.  He testified that he left his home around 11:00 p.m. to walk to a Rally's Restaurant on St. Claude and St. Roch.  As he passed the house where the two men had disappeared the previous night, he observed Brown coming towards him from across the street.  Brown stepped in front of him, pulled a gun and said, "So, you're our snitch."  Mr. Collins testified that he recognized Brown from the neighborhood because he had seen him before at the house where he had seen the two men run towards the night before.  He testified that as soon as Brown spoke to him he was struck from the side just above his left eye. He placed his hands up to guard himself from being struck

---

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 5, Bill of Information, 4/3/07.

[4]Id.

again and fell to his knees as he was pushed to the ground.  Brown then told the other person, "Take what he's got."  Mr. Collins felt hands going through his pockets, and as Brown and the other person walked away they told Mr. Collins that if he called the police they would kill him.  Mr. Collins' wallet and cell phone were taken.  As he stood up he felt blood streaming down his face and he was unable to see.  He started walking towards his home while one of his neighbors called an ambulance.  After a short while a marked police unit arrived on the scene and began to question Mr. Collins.  Because he was feeling very dizzy he did not answer any questions.  He was transported by ambulance to Touro Infirmary.  At Touro he spoke to a few doctors and a detective.  He described the perpetrator as a thin black male with a medium build wearing dread locks pulled back into a ponytail.  He told them that he did not know Brown's name but that he had recognized him from the neighborhood.  Later that night he was shown a photographic line-up with six photographs.  He identified number five, Brown's photograph, as the person who robbed him.  He signed and dated the back of the photo.  Mr. Collins testified that his identification of Brown was "instantaneous" and that he was "a hundred percent sure."

On cross-examination, Mr. Collins testified that when he saw the men run across St. Roch the previous night, they were about a one and one-half house distance from him.  He could not say if these were the same men who robbed him.  He testified that he told the police that he thought the two instances were in some way linked, but denied telling them that Brown was one of the two men he saw the previous night.  He stated that he kept to himself and had only lived in the neighborhood for two months and in New Orleans for three years.  He testified that almost every night as he walked home from work he observed the same women sitting on the porch of the house where the two men were seen running the night before.  He testified that he did not see the police speak to them the night before. He again testified that Brown was the person who robbed him and that he was sure of it.  He testified that Brown was wearing a black shirt but did not know the sleeve length.  He also did not remember seeing any tattoos or gold teeth.  He testified that he could not identify the second perpetrator who struck him.

On re-direct examination, Mr. Collins testified that he never told the police that the same two people he saw running across St. Roch the previous night were the same people who robbed him.  On the night of the robbery he only saw Brown walking across the street towards him, and that

he knew that there was a second perpetrator because when he was struck from the side, Brown was standing in front of him.

Detective James Clarkson testified at trial that he was assigned to investigate the armed robbery of Scot Collins.  During an interview with Mr. Collins, Mr. Collins informed him that as he was walking in the 1300 block of St. Roch Avenue he was approached by two black males, one that he knew from the neighborhood.  Brown approached Mr. Collins with a gun and said, "You must be our snitch from the neighborhood."  Mr. Collins gave Det. Clarkson a description of Brown. Det. Clarkson testified that he showed Mr. Collins a photographic line up of six pictures, and Mr. Collins identified Brown's picture which was number five. Mr. Collins signed and dated Brown's photo.  At Mr. Collins' request Det. Clarkson, out of a concern for Mr. Collins' safety, did not put a warrant out for Brown's arrest until Mr. Collins moved from the neighborhood.

On cross-examination, Det. Clarkson denied knowing of a 911 call that was made moments after the robbery by a person named Michael.  The detective testified that he never heard of this person and did not question him.  He testified that there were some subjects sitting on a porch at 1326 St. Roch, who may have seen the robbery, but he was unable to identify or locate them after several attempts.  He denied that Mr. Collins told him that Brown was one of the two men he had seen the night before.  He testified that he searched the area in the 1300 block of St. Roch but never found the gun used in the robbery.  He again reiterated that he did not issue an arrest warrant for Brown until the victim had moved from the neighborhood.  As a consequence, he admitted that he did not question anyone in the neighborhood until the victim moved because he did not want to tip off that it was Brown who had threatened to kill the victim.

On re-direct examination, Det. Clarkson testified that he was given information about the location of the crime scene from the officers who first responded to the scene and went to the scene on the night of the robbery.  He stated he looked for a gun but never found one.

On cross-examination, Detective Clarkson testified that his investigation never resulted in any witnesses to the robbery.

Mr. Collins was re-called to testify. He testified that on the night before the robbery, the women sitting on the porch where he observed the two men run, told him, "Mind your own business."

Defendant, Kendrelle Brown, took the stand in his own defense.  He testified that he lived at 5005 Eldemario (spelled phonetically) Street in Houston, Texas, from the day that Hurricane Katrina destroyed his home

4

at 2216 St. Roch Avenue where he lived with his uncle and aunt.  He admitted being familiar with the house located at 1326 St. Roch Avenue, but denied having been there since before the hurricane.  He testified that he became aware that there was a warrant for his arrest when his aunt called him and told him that his picture was on the news.  After a couple of days he turned himself in to the police.  He testified that he could not remember his whereabouts on October 25, 2006.  He testified that prior to the hurricane he worked as a mechanic at his uncle's shop uptown.  He denied using drugs, having ever been in jail, or robbing Scot Collins.

On cross-examination, Brown testified that he had been living in Houston since August 29, 2005, and had been in New Orleans since the summer of 2006, sleeping in his car or at his friend's house on Spain Street.  He admitted that he did not have a driver's license.  He stated that the car he drives belongs to his girlfriend and that she lives across the river on Terry Parkway.  He did not know the address.  He testified that on October 25, 2007, he was staying with his friend on Spain Street.  He denied having any friends living on St. Roch.  He denied knowing or ever having seen the victim, and he testified that he did not own, nor carry a gun.  He denied robbing the victim.

State v. Brown, 999 So.2d 359 (Table), 2009 WL 8684637, *1 (La. App. 4th Cir. 1/14/09), No. 2008-KA-0739.  St. Rec. Vol. 2 of 5.[5]

Brown was tried before a jury on July 18, 2007, and found guilty of armed robbery as charged and simple battery.[6]  On February 14, 2008, after numerous continuances, Brown's motions for post-judgment verdict of acquittal and for a new trial were denied.[7]  On February 20, 2008, the trial court sentenced Brown for his simple battery conviction

---

[5]In the bill of information and in the trial transcript the victim's first name is spelled "Scott," rather than "Scot," as set forth in the Louisiana Fourth Circuit's opinion. I will use the spelling "Scott" in my report and recommendation.

[6]St. Rec. Vol. 1 of 5, Trial Minutes, 7/18/07; Guilty Verdicts, 7/18/07. Simple battery was a responsive verdict with respect to the second degree battery charge.

[7]Id., Trial Minutes, 2/14/08.

to six (6) months imprisonment and for his armed robbery conviction to 15 years imprisonment, with the sentences to run concurrently.[8]

In his direct appeal, Brown raised two errors:[9] (1) There was insufficient evidence to support his convictions. (2) He was denied a meaningful opportunity to prepare his defense when the bill of information, over defense counsel's objection, was amended on the day of trial. On January 14, 2009, the Louisiana Fourth Circuit affirmed Brown's convictions and sentences. State v. Brown, 999 So.2d 359 (Table), 2009 WL 8684637, *1 (La. App. 4th Cir. 1/14/09), No. 2008-KA-0739. St. Rec. Vol. 2 of 5.

On February 3, 2009, Brown filed a writ application with the Louisiana Supreme Court asserting the same claims he had raised in the Louisiana Fourth Circuit.[10] On November 6, 2009, the Louisiana Supreme Court denied Brown's writ application without opinion. State v. Brown, 21 So.3d 300 (La. 2009), 2009-KO-0390. St. Rec. Vol. 3 of 5. Brown's convictions became final 90 days later, on February 4, 2010, when he did not file a writ application with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003) (citing 28 U.S.C. § 2244(d)(1)(A); Flanagan v. Johnson, 154 F.3d 196, 200–01 (5th Cir. 1998)); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (citing 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup.Ct. R. 13(1).

---

[8]Id., Trial Minutes, 2/20/08.

[9]St. Rec. Vol. 2 of 4, Appeal Brief, 2009-KA-0739, 7/7/08.

[10]St. Rec. Vol. 3 of 5, Application for Writ of Certiorari, State v. Brown, 2009-KO-0390, 2/3/09.

On January 20, 2010, Brown filed an application for post-conviction relief in the state trial court.[11] Citing federal case law, Brown raised the following claims: (1) He received ineffective assistance of counsel. (2) During pre-trial proceedings, the State committed prosecutorial misconduct by failing to disclose exculpatory evidence. (3) The court reporter filed a false transcript.  On March 24, 2010, the state district court denied Brown's post-conviction application as both untimely and without merit.[12]

On April 13, 2010, Brown filed an application for writ of review in the Louisiana Fourth Circuit concerning the district court's denial of post-conviction relief.[13]  In his writ application, Brown asserted the same claims raised in his district court brief.  On May 6, 2010, the Louisiana Fourth Circuit denied Brown's writ application, stating: "Though the district court erred by denying the application as untimely, this court finds no error in the district court's judgment that found no merit to his claims."[14]

On or about May 28, 2010, Brown filed his application for writ of certiorari in the Louisiana Supreme Court.  In his supporting memorandum Brown did not set forth his claims.  Instead, he argued that the lower courts had erred in denying him relief and attached copies of the memoranda he filed with the lower courts and the courts'

---

[11]St. Rec. Vol. 1 of 5, Uniform Application for Post-Conviction Relief (signed 1/20/10).

[12]Id., District Court Order, signed 3/24/10.

[13]St. Rec. Vol. 4 of 5, 2010-K-0559, signed 4/13/10.

[14]St. Rec. Vol. 4 of 5, 2010-K-0559 (La. App. 4th Cir. 5/6/10).

opinions.[15] On May 27, 2011, the Louisiana Supreme Court denied Brown's writ application without reasons.[16]

## II.    FEDERAL HABEAS PETITION

On June 13, 2012, the clerk of this court filed Brown's petition for federal habeas corpus relief in which Brown asserts the following arguments: (1) He received ineffective assistance of counsel.  (2) The State withheld exculpatory evidence.  (3) He was denied a complete and accurate trial transcript.[17] The State filed a response in opposition to Brown's petition conceding timeliness, but asserting that Brown had failed to exhaust his state court remedies because, rather than specifically identifying his claims before the Louisiana Supreme Court, he merely attached the memoranda he had filed in the state district and appellate courts.[18]

## III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation,

---

[15]St. Rec. Vol. 4 of 5, 2010-KH-1228, filed 5/28/10.  Brown did not sign his writ application and there is no evidence of a postmark date. In this matter, timeliness is not in dispute and, therefore, a precise filing date is not essential.

[16]State ex rel. Brown v. State, 63 So.3d 994 (La. 2011), 2010-KH-1228.  St. Rec. Vol. 4 of 5.

[17]Rec. Doc. No. 1.

[18]Rec. Doc. No. 13, pp.  10-12.

including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[19] and

applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198

(5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore

applies to Brown's petition, which, for reasons discussed below, is deemed filed in this

federal court on May 18, 2012.[20]

The threshold questions in federal habeas review under the amended statute are

whether the petition is timely and whether the claims raised by the petitioner were

adjudicated on the merits in state court; i.e., the petitioner must have exhausted state

court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson,

127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes and I find that Brown's habeas petition is timely filed.  The

State, however, asserts that Brown had failed to exhaust his state court remedies because,

rather than specifically identifying his claims before the Louisiana Supreme Court, he

---

[19]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[20]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Brown dated his signature on the petition on May 18, 2012. Rec. Doc. No. 1, p. 16. This is the earliest date appearing in the record on which he could have delivered his pleading to prison officials for mailing.

merely attached copies of the memoranda he had filed with the state district and appellate courts, along with the courts' opinions.

## IV.    EXHAUSTION OF STATE COURT REMEDIES

"A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."  Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Rose v. Lundy, 455 U.S. 509, 519-20 (1982));  accord Preiser v. Rodriguez, 411 U.S. 475, 500 (1973); Nobles, 127 F.3d at 419.   "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court."  Id. (citing Picard v. Connor, 404 U.S. 270, 275-78 (1971)) (emphasis added). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures.  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); accord Duncan v. Walker, 533 U.S. 167, 177-79 (2001).  It is not enough for a petitioner to have asserted the claims in the lower state courts if the claims were not specifically presented to the state's highest court.  Baldwin v. Reese, 541 U.S. 27, 32 (2004) (a prisoner does not fairly present a claim to a state court if that court must read beyond a petition or brief, such as a lower court opinion, to find the claim).

Brown did not specifically identify his claims in the writ application presented to the Louisiana Supreme Court.  Instead, he merely attached to his writ application the memoranda filed with lower state courts, in which the claims were specifically asserted, along with the courts' opinions.

Brown's failure to present his claims within the four corners of the writ application filed with the Louisiana Supreme Court does not appear to satisfy the exhaustion requirement dictated by the Supreme Court in <u>Baldwin</u>.  <u>See</u> <u>U.S. ex rel. Class v. Johnson</u>, 2010 WL 3273538, *9 n. 2 (N.D. Ill. 8/18/10) (based upon <u>Baldwin</u>, the district court rejected petitioner's argument that the attachment of a lower court opinion to a writ application filed before the state supreme court was sufficient for exhaustion purposes).  However, in a case involving circumstances similar to those in this case, the United States Court of Appeals for the Ninth Circuit found that state court remedies had been exhausted.

In <u>Miller v. Quinn</u>, 307 Fed. Appx. 96, 98 (9th Cir. 2009), in his brief to the Washington Supreme Court, petitioner "did not refer to the federal constitution, federal statutes or case law, or state case law analyzing federal constitutional issues."  The petitioner however, had "cited such law quite extensively" in the petition filed with the Washington Court of Appeals. The prisoner attached his lower court "petition and accompanying briefs as appendices to his motion for discretionary review to the Washington Supreme Court." <u>Id</u>.  Thus, the Ninth Circuit found that the state supreme

11

court filing satisfied the exhaustion requirement, distinguishing <u>Baldwin</u> because the

petitioner actually attached his lower court pleadings to his state supreme court brief,

whereas the petitioner in <u>Baldwin</u> had not.

> [T]he Supreme Court's concern in <u>Baldwin</u> was that state courts should not be forced to search for federal claims by reading through the whole of the lower court record.  <u>See</u> 541 U.S. 27, 32, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (holding that a prisoner must present his or her claim in "a petition or a brief (<u>or a similar document</u>)" in order to exhaust), <u>rev'g</u>, 282 F.3d 1184 (9th Cir. 2002) [emphasis added].   In <u>Baldwin</u>, the lower court opinion was not filed with or attached to the petition filed in the state supreme court, unlike the . . . petitions here . . . .  <u>See</u> <u>Reese v. Baldwin</u>, 282 F.3d at 1194-95 (T.G. Nelson J., dissenting) ("[T]he majority would . . . requir[e] [state supreme court justices] to root through the record for rare truffles of legal support.").  Since Miller's [earlier] petition was filed as an appendix to his motion for discretionary review, Miller's federal claim was presented to the Washington Supreme Court in "<u>a similar document</u>" to his brief [emphasis added].

<u>Id</u>.  <u>See</u> <u>also</u> <u>Insyxiengmay v. Morgan</u>, 403 F.3d 657, 668 (9th Cir. 2005) (petitioner

exhausted his state court remedies where his federal claims were raised in his petition

filed with state appellate court, which was also attached as an appendix to his filing

before the state supreme court).

    I am not convinced that the <u>Baldwin</u> Court, by virtue of the language, "(or a

similar document)," intended that attached lower court pleadings specifically setting forth

federal claims, with citation to federal case law, are insufficient to put a state supreme

court on notice of said claims for exhaustion purposes.  However, even if <u>Baldwin</u> could

be read so broadly as to indicate that Brown has not exhausted his state court remedies,

12

because Brown's claims are clearly without merit, I will address them without requiring more specific exhaustion.  28 U.S.C. § 2254(b)(2).

V.    STANDARDS OF MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210

13

F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25);

Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

14

VI.     INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NO. 1)

Brown asserts that his trial counsel was ineffective in failing to request a continuance after the State amended the bill of information.  Brown states conclusorily that his counsel was ineffective in this regard.  He sets forth no argument to support this claim.[21]  He also argues that his counsel was ineffective in failing to perform even a minimal investigation to obtain defense witnesses and that such witnesses could have been uncovered if counsel had performed an adequate pre-trial investigation utilizing information contained in the police report.  Brown further argues his counsel permitted the victim, Scott Collins, to offer "contradictory or questionable testimony without cross-examin[ation]."[22]

The issue of ineffective assistance of counsel is a mixed question of law and fact.  Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance

---

[21]Rec. Doc. No. 1, p. 10.

[22]Id. at pp. 10-11.

of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697.  The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  Kimler, 167 F.3d at 893.  A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'"  Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance."  Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999) (citing Strickland, 466 U.S. at 689-90).  In assessing counsel's performance, a

16

federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d at 236-37; Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001).

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 788 (2011). The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and

Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)).  Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  Strickland, 466 U.S. at 689; Moore v. Johnson, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient.  Id.

In this case, the bill of information reflects that it was amended on July 18, 2007, the date of Brown's trial.  The only information amended was the date of the crimes, changed from January 30, 2007 to October 25, 2006.  The charges against Brown and the name of the victim remained the same.[23]

In state prosecutions, due process mandates only that the charging instrument provide the defendant with fair notice of the charges against him to permit adequate preparation of his defense.  Williams v. Haviland, 467 F.3d 527, 535 (6th Cir. 2006); Valentine v. Konteh, 395 F.3d 626, 631 (6th Cir. 2005) (due process requires that the charging instrument provide sufficient notice of the charges and protects the defendant against double jeopardy) (citing Russell v. United States, 369 U.S. 749 (1962)).  See also McKay v. Collins, 12 F.3d 66, 69 (5th Cir. 1994) (the standard for determining the sufficiency of an indictment is based upon practical considerations) (citing United States v. Chaney, 964 F.2d 437, 446 (5th Cir. 1992)).

---

[23]St. Rec. Vol. 1 of 5.

The dates of the offenses were not essential elements of the crimes with which Brown was charged.  <u>Brown</u>, 2009 WL 8684637 at *5.  The amendment of the bill of information to correct the crime dates did not deprive Brown of notice of the charges against him and did not prevent him from preparing a defense.  There was no legitimate basis to continue the trial due to this amendment of the bill of information.  A motion for continuance would have been futile.  Counsel cannot be ineffective for failing to pursue a futile course of action.  <u>United States v. Manley</u>, 2011 WL 2259761, *3 (E.D.Pa.2011); <u>see</u> <u>Lindsey v. Cain</u>, 267 Fed. Appx. 374, *1 (5th Cir. 2008) (counsel is not ineffective by failing to raise frivolous or futile claims) (citing <u>Johnson v. Cockrell</u>, 306 F.3d 249, 255 (5th Cir. 2002)).

Brown also argues that due to inadequate pre-trial investigation, his counsel failed to obtain witnesses which would have contradicted the victim's testimony and undermined the prosecution's theory of the case.  According to Brown, the necessary witnesses could have been discovered upon review of the "critical information" contained in the police report.  Brown also claims that his counsel failed properly to cross-examine Collins.  Brown suggests that his counsel should have been able to attack Collins's identification of Brown as his assailant. He argues that "Mr. Collins testified

19

that he only had seconds to view his alleged perpetrators.  He was unable to provide any definitive descriptions of his assailants."[24]

The only potential defense witness identified by Brown is Thomasine Bartlette. Brown asserts that if his counsel had performed a proper investigation "he would have discovered that Ms. Tomasine Bartlette owns the property at 1326 St. Roch Street, New Orleans, Louisiana."[25]  "As such, Ms. Bartlette was available and willing to testify that she purchased said property in 2003, and that none of her tenants who resided at the property during the period at issue knew the Petitioner or any black female who sat outside to listen to music."[26]

At trial, Scott Collins testified that he saw women outside on the porch of a house, that Brown and an accomplice approached him from the house, that Brown pulled a gun on him and accused him of being a "snitch," and then he was hit and robbed.[27]  Collins offered no testimony about the address of the house; however, the police report and the testimony of investigating detective James Clarkson reflect that the address of the house was 1326 St. Roch Avenue.  The police report states that an officer was dispatched "to

---

[24]Rec. Doc. No. 1, pp. 10-11.

[25]<u>Id</u>. at p. 12.

[26]<u>Id</u>.

[27]St. Rec. Vol. 2 of 5, p. 128.

investigate an armed robbery that occurred at 1326 St. Roch St."[28]  On cross-examination

Detective Clarkson was asked whether he was aware of any individuals who may have

been witnesses to the armed robbery.  Clarkson responded:  "There were some subjects

that [were] possibly at 1326 St. Roch . . . .  I went to that residence and no one was there.

I went there several times."[29]  Clarkson stated that he went to the residence in response

to the victim's statement that there were women sitting on the porch listening to music.

The victim believed that the women told Brown that he was the snitch, prompting Brown

and his accomplice to point a gun at him, hit and rob him.[30]

"'Complaints of uncalled witnesses are not favored, because the presentation of

testimonial evidence is a matter of trial strategy and because allegations of what a witness

would have testified are largely speculative.'"  Graves v. Cockrell, 351 F.3d 143, 156

(5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)).

"'Failure to present [evidence does] not constitute 'deficient' performance within the

meaning of Strickland if [counsel] could have concluded, for tactical reasons, that

attempting to present such evidence would be unwise.'"  Williams v. Cockrell, 31 Fed.

Appx. 832 (5th Cir. 2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).

---

[28]St. Rec. Vol. 1 of 5. The police narrative is attached as exhibit B to Brown's application for post-conviction relief.

[29]St. Rec. Vol. 2 of 5, p. 157.

[30]Id. at p. 158.

Brown's allegation that Bartlette would have testified that she purchased the property at 1326 St. Roch Avenue in 2003, "and that none of her tenants who resided at the property during the period at issue knew the Petitioner or any black female who sat outside to listen to music"[31] is clearly speculative.  As evidenced by her undated letter contained in the state court record, Bartlette states nothing more than that she has been an owner of the property at 1326 St. Roch Avenue since 2003 and that "Kendrelle Brown has not been a tenant in this property during the period I have owned it."[32]

Other than his claim that his counsel failed to uncover Bartlette as a witness, Brown provides no specifics as to what evidence or other witnesses counsel might have discovered had he performed additional pre-trial investigation.  The only alleged witnesses were the women on the porch, whom Detective Clarkson unsuccessfully attempted on several occasions to locate.  Brown makes no suggestion as to what further measures his counsel could have taken to locate the witnesses.

"'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" (emphasis added, citation omitted) Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998).  A petitioner cannot show prejudice as to

---

[31]Rec. Doc. No. 1, p. 12.

[32]St. Rec. Vol. 1 of 5. Bartlette's letter is attached to Brown's post-conviction application as exhibit A.

a claim that his counsel failed to investigate without adducing what the investigation would have shown. Diaz v. Quarterman, 239 Fed. Appx. 886, 890 (5th Cir. 2007) (citing Strickland, 466 U.S. at 696, in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different."). Rather, to prevail on such claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed. Moawad, 143 F.3d at 948; Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008) (order adopting referenced Report and Recommendation).

Brown also argues that "Mr. Collins was allowed to offer contradictory or questionable testimony without cross-examin[ation]."[33] Brown insinuates that his counsel should have been able to raise reasonable doubt in the minds of jurors as to whether he was the perpetrator, since Collins had only seconds to view the perpetrators and was unable to provide "definitive descriptions" of his assailants.[34]

The trial transcript abundantly reflects that Collins's testimony regarding his identification of Brown was neither contradictory nor questionable. Collins stated that he knew his assailant, having seen him around the neighborhood, and that he was "a

---

[33]Rec. Doc. No. 1, p. 11.

[34]Id.

hundred percent sure" that Brown was the man who pulled a gun on him.[35]   When

provided with a six-photo lineup, Collins testified that he quickly identified Brown as the

person who pointed a gun at him.

> Q. [W]ere you ever shown a photographic lineup?
> A. Yes.
> Q. . . . Mr. Collins, I'm handing you what's marked as State's Exhibit 7.
> Do you recognize what I've handed you?
> A. Yes.
> Q. What have I handed you?
> A. You've handed me the photo lineup I was shown . . . .
> Q. Okay.  Now, when you were shown that lineup, were you able to make a selection?
> A. Yes.
> Q. Were you forced, coerced or threatened in any way to select anyone in particular?
> A. No.
> Q. Okay.  Are there any markings on that lineup to indicate who you selected?
> A. Yes, on the back of the lineup.
> Q. And what number did you select?
> A. On the back, number five, and I signed and dated it.
> Q. Okay.  Who's pictured in number five?
> A. The man in the courtroom today who pulled the gun on me.
> Q. Now, when you were shown this lineup how long did it take you to make an identification?
> A. After I was shown it, it was pretty instantaneous.  I was a hundred percent sure.[36]

Contrary to Brown's claim, the trial transcript reflects that defense counsel

strenuously cross-examined Collins, establishing through his questioning that Collins

---

[35]St. Rec. Vol. 2 of 5, pp. 132-33.

[36]Id.

could not identify the men he had seen fleeing the scene the night before the robbery and

using Collins's testimony in this regard to cast aspersions on Collins's identification of

Brown as the armed robber.

> Q.  Mr. Collins you said that this whole incident started on the night before you were allegedly robbed, correct?
> A.  Yes.
> Q.  And you said it started with an incident where two individuals ran across the street?
> A.  Yes.
> Q.  And that you pointed out these individuals later to the police, or pointed out the direction in which they ran?
> A.  Yes.
> Q.  And how far away were these individuals when they ran?
> A.  One address behind me.
> Q.  One what?
> A.  One and a half houses.  They were in between two houses.
> Q.  And you had to actually turn around and see them run past, correct?
> A.  Yes.  I turned around.  I heard them before I saw them.
> Q.  Right.  You heard them and then you turned like this and saw them pass?
> A.  Yes.
> Q.  Okay.  The individual that robbed you, was he in front or behind?
> A.  He was in front.
> Q.  Okay.  How would you describe that individual?
> A.  The individual from the night before.
> Q.  Yes.  The individual that you saw run across the street that night, one house away form you, and we're talking about a distance of one house, from here to the back of the room?
> A.  Yeah.
> Q.  That far?
> A.  Yeah.
> Q.  And was that individual already past you when you turned around?
> A.  They were right about in line with me.
> Q.  How long did it take them to get out of your eyesight?
> A.  Not very long.
> Q.  Seconds?

25

A. Yeah.

Q. And you're a hundred percent sure that this is the same individual that robbed you?

A. No, I can't say that.

Q. So you're not even sure that the individuals that you saw run past is [sic] the same individuals that robbed you?

A. No, I can't say that I do know that.[37]

Defense counsel also challenged Collins's testimony that he recognized Brown from having seen him in the neighborhood.

Q. So, you didn't associate very much with people in the neighborhood?

A. Just on my way to work and on my way home I would say hi to people as I passed.

Q. You didn't grow up there?

A. No, I didn't.

Q. You're not familiar with the area?

A. I'm familiar with it but not a whole lot . . . .

Q. Did you go to high school or any school with the individuals that robbed you, or you claimed robbed you?

A. No . . . .

Q. It's not like you had any sort of relationship or connection to this person, where you saw that person that robbed you on a daily basis?

A. No.

Q. You recognized him as being someone that you recognized from the neighborhood, correct?

A. Yeah.

Q. Not a neighborhood you grew up in, but a neighborhood you resided in for two months?

A. Yes.

Q. Right?

A. Yes.

---

[37]Id. at pp. 133-34.

Q.  You lived in that neighborhood for all of about two month before the robbery?
A.  Yes.[38]

Despite Detective Clarkson's repeated efforts to locate others, Collins was the only witness to the crime, and he stated he was 100 percent sure that Brown was the person who pulled a gun on him. Defense counsel, via cross-examination, attacked Collins's credibility, focusing on Collins's inability to identify Brown the night before the robbery and the veracity of the conclusion that Collins could have recognized Brown from the neighborhood, when Collins had only lived in the neighborhood for a short time. Counsel also called Brown as a witness, and he testified that he had never seen Collins before and that he had not been in the St. Roch neighborhood since Hurricane Katrina.[39]

The fact that counsel's strenuous cross-examination challenging Collins's credibility was not successful, i.e. that the jury believed Collins and convicted Brown, does not mean that counsel's actions were constitutionally deficient. See Martinez v. Dretke, 99 Fed. Appx. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted).

---

[38] Id. at pp. 135-36.

[39] Id. at p. 172-73.

The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Strickland.  Brown is not entitled to relief on this claim.

VII.    DISCLOSURE OF EXCULPATORY EVIDENCE (CLAIM NO. 2)

Brown contends that "the state withheld exculpatory evidence provided by the state's only witness, Scott Collins.  Specifically, the state failed to disclose that its witness had knowingly submitted two false or conflicting statements regarding certain critical facts in the case."[40]  Brown states that Collins made a statement to police which conflicted with his statement at trial.  Brown points to the description Collins provided to police of the men who robbed him and contrasts this with Collins's trial testimony that he could not describe the men.[41]

The United States Supreme Court has held that suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963); Youngblood v. West Virginia, 547 U.S. 867, 869–70 (2006).  A claimed Brady violation represents a mixed question of law and fact.  Banks v. Thaler, 583 F.3d 295, 309 (5th Cir. 2009), cert. denied, _ U.S. _, 130 S.Ct. 2092 (2010).

---

[40]Rec. Doc. No. 1, p. 12.

[41]Rec. Doc. No. 1, pp. 12-13.

28

In this case there could be no conceivable wrongdoing by the prosecution because there were no conflicting statements.  The police report reflects that the description provided by Collins was for the man who pulled a gun on him.[42]  In contrast, Collins's trial testimony was that he could not provide descriptions of the men he saw fleeing the scene the night <u>before</u> he was assaulted and robbed.[43]  The trial testimony and pretrial identifications provided by Collins that Brown was the person who confronted and robbed him were clear, definite and entirely consistent.

Brown's claim that the prosecution failed to disclose favorable evidence is entirely lacking in factual support.  The state courts' denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent.  Brown is not entitled to relief on this claim.

## VIII.   ACCURACY OF TRIAL TRANSCRIPT (CLAIM NO. 3)

Brown claims that he was denied a "complete and accurate transcript" on appeal. Brown states that two different transcripts were prepared, one for the Louisiana Fourth Circuit Court of Appeal and another for appellate counsel.  Brown alleges that certain

---

[42]St. Rec. Vol. 1 of 5.

[43]St. Rec. Vol. 2 of 5, p. 134.

portions of the transcript were "adjusted" to make the transcript more favorable to the State.  Brown also asserts that the transcript "contained testimony that never occurred."[44]

Brown's claim regarding an incomplete/inaccurate transcript appears to present a mixed question of fact and law, since the factual basis supporting his allegation of an incomplete/inaccurate transcript must be reviewed, followed by a legal determination as to whether any incomplete and/or inaccurate transcript violated Brown's constitutional rights.[45]

It is indisputably true that a criminal defendant has the right to adequate appellate and other review of his conviction based upon a sufficiently complete and accurate record.  Mayer v. City of Chicago, 404 U .S. 189, 198 (1971).  A criminal defendant, however, is not entitled to a verbatim transcript or a totally accurate transcript.  Fahy v. Horn, 516 F.3d 169, 190 (3rd Cir. 2008) (due process does not require a verbatim transcript of entire proceedings), cert. denied, 537 U.S. 1192 (2003) (citation omitted); Hampton v. Segura, 276 Fed. Appx. 413, 415 (5th Cir. 2008) (no constitutional right to a totally accurate transcript) (quotations omitted).  A defendant must show that he was prejudiced by virtue of the incomplete and/or inaccurate transcript.  Fahy, 516 F.3d at 190 (the defendant must show a colorable need for the missing transcript) (quotation and

---

[44]Rec. Doc. No. 1, p. 15.

[45]I have located no case law expressly addressing whether an alleged constitutional violation based upon an incomplete and/or inaccurate transcript represents a question of fact or law or a mixed question of fact and law for habeas review purposes under AEDPA.

citation omitted); <u>Hampton</u>, 276 Fed. Appx. at 415 (the defendant must show how "the inaccuracies <u>materially</u> altered the transcript") (emphasis original).

Volumes 1, 2 and 5 of the state record contain transcripts of the trial. The first pages of the transcripts contained in volumes 1 and 5 state: "(Testimony of Scott Collins Only)."[46]   The transcript in volume 2 contains no such qualification. Brown has submitted no evidence reflecting that a transcript consisting of the "(Testimony of Scott Collins Only)," <u>i.e.</u> an incomplete transcript, was provided to appellate counsel, while the full transcript was provided to the state appellate court.  Moreover, Brown provided no evidence to support his bald-faced claim that portions of the transcript were "adjusted" and that it "contains testimony that never took place."[47]

A habeas petitioner's mere speculations that his trial transcript was inaccurate are wholly insufficient to warrant habeas relief.  <u>Norris v. Schotten</u>, 146 F.3d 314, 333 (6th Cir.) (Petitioner's own speculations are insufficient to justify even a suspicion that the transcripts are inaccurate), <u>cert</u>. <u>denied</u>, 525 U.S. 935 (1998).  Further, Brown has made no showing of prejudice as a result of the allegedly inaccurate transcript.  <u>Shire v. Costello</u>, 2008 WL 2323379, *7 (N.D.N.Y. June 2, 2008) (not only must a petitioner

---

[46]These transcripts were attached to Brown's applications for post-conviction relief filed with the state trial court (vol. 1) and with the state appellate court (vol. 5).

[47]A review of the "(Testimony of Scott Collins Only)" transcripts with the testimony of Scott Collins in the volume 2 transcript reflects that they are <u>identical</u>. Further, with the exception of two missing pages, the transcribed testimony of the other trial witnesses, Detective James Clarkson and Kendrelle Brown, contained in volumes 1, 2 and 5, are identical. The transcripts in volumes 1 and 5, copied as attachments to Brown's pro se post-conviction applications, are missing pages 56 and 58.

submit "substantial evidence" that the transcript is inaccurate, he must also show actual prejudice resulting from the inaccurate transcript).

I find that the state courts' rejection of Brown's wholly speculative, conclusory and self-serving claim of an incomplete and/or inaccurate trial transcript was not contrary to or an unreasonable application of clearly established federal law.  He is not entitled to federal habeas corpus relief as to this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that the petition of Kendrelle Brown for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[48]

New Orleans, Louisiana, this _____22nd_____ day of February, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[48]Douglass referenced the previously applicable ten-day period for the filing of objections.
Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.